LARRY D. BARNETTE AND KATHLEEN C. BARNETTE, ET AL., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Barnette v. Commissioner
Docket Nos. 16906-82, 22809-82, 535-85, 620-85, 29224-85, 355-88, 3282-88, 3283-88, 3285-88, 11681-88, 11682-88, 17821-88
United States Tax Court
T.C. Memo 1992-371; 1992 Tax Ct. Memo LEXIS 389; 63 T.C.M. (CCH) 3201; June 29, 1992, Filed *389 Decision will be entered under Rule 155. John Harllee, Jr., for petitioners Larry D. Barnette, Allied Management Corp., Janet L. Barnette, and Leo David Barnette. Trevor W. Swett III, Richard E. Timbie, and Jill R. Shellow, for petitioner Kathleen C. Barnette. John F. Dean, Bobby D. Burns, and Eli J. Dicker, for respondent. KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: In these consolidated cases the Commissioner determined deficiencies in and additions to petitioners' Federal income taxes as follows: Larry D. Barnette and Kathleen C. Barnette
Docket Nos. 16906-82, 535-85, and 355-88
Year
Deficiency
Additions to Tax
Sec. 6653(b)
Sec. 6661
1977
$ 1,045,820
$   522,910
--  1978
3,276,776
1,638,388
--  1979
4,341,256
2,170,628
--  1980
3,398,832
1,699,416
--  1982
1,848
--  --  1983
855,179
--  $ 213,795
1984
604,108
--  151,027
Larry D. Barnette
Docket Nos. 3282-88 and 3283-88
Year
Deficiency
Additions to Tax
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6661
1985 [1]
$ 3,059,392
--  --  $ 764,848
1985 [2]
40,020
$ 10,005
[3] $ 2,001
10,005
*390 Kathleen C. Barnette
Docket No. 17821-88
Year
Deficiency
Addition to Tax
Sec. 6661
1985
$ 1,353,834
$ 338,459
Janet L. Barnette
Docket No. 11681-88
Year
Deficiency
Additions to Tax
Sec. 6661
1984
$ 29,567
$  7,392
1985
78,506
19,627
Leo David Barnette
Docket No. 11682-88
Year
Deficiency
Additions to Tax
Sec. 6661
1984
$ 31,738
$ 7,935
1985
79,652
19,913
Allied Management Corp.
Docket Nos. 22809-82, 620-85, 29224-85 and 3285-88
Year
Additions to Tax
Ended
Deficiency
Sec. 6653(b)
Sec. 6661
5/31/75
$    23,128
$     11,564
$     --  5/31/78
1,635,294
817,647
--  5/31/79
4,079,999
2,040,000
--  5/31/80
2,537,287
1,268,643
--  5/31/81
970,405
485,202
--  5/31/82
1,090,092
917,717
--  5/31/84
79,338
--  19,835
5/31/85
1,660,527
--  415,132
5/31/86
3,716
--  --  Following concessions, [2] the issues for decision are: (1) Whether, for Federal tax purposes, JETS Wascherei GmbH (JETS Wascherei) was a subsidiary or a branch of its parent; (2) whether profits from West German laundry contracts should have been reported on the consolidated returns of petitioner Allied Management *391 Corp. (hereinafter Allied) for the fiscal years ending May 31, 1978, 1979, 1980, and 1981; (3) whether the transfer of JETS Wascherei from Job Employment Temporary Services, Inc. (J.E.T.S.), to Old Dominion Corp., S.A. (Old Dominion) should be recognized for tax purposes; (4) whether petitioners Larry D. Barnette (Barnette) and Kathleen C. Barnette (Ms. Barnette) failed to report subpart F income from a controlled foreign corporation on their joint returns for years 1977 through 1980; (5) whether petitioners Barnette and Ms. Barnette failed to report $ 51,825 in bonding fee income on their joint 1980 return; (6) whether Ms. Barnette should be relieved of her tax liability for years 1977 through 1980 pursuant to section 6013(e); [3] (7) whether Old Dominion's foreign personal holding company income for 1983, 1984, and 1985 should be taxable to the holders of the common stock rather than the holder of the preferred stock; (8) hether a transfer of $ 3,625,000 from Old Dominion to Allied resulted in an actual dividend from Old Dominion to Barnette in 1985, or, alternatively, whether petitioners Ms. Barnette, Janet L. Barnette, and Leo D. Barnette failed to include as income on their respective *392 1985 returns their pro rata share of Old Dominion's increase in earnings invested in U.S. property pursuant to section 951; (9) whether Barnette failed to report a total of $ 5,930,378 as a dividend from Allied on his 1985 return as a result of Allied's making $ 7 million available to him to post bond so as to remain at liberty during the pendency of his criminal appeal; (10) whether the 1985 redemption of Old Dominion common and preferred stock held by Jets Services, Inc. (Jets Services), resulted in ordinary income rather than capital gain being reportable on Allied's 1985 return; (11) whether Barnette's underpayments of tax for years 1977, 1978, 1979, and 1980, and Allied's underpayments of tax for fiscal years ending May 31, 1975, 1978, 1979, 1980, 1981, and 1982, were due to fraud; (12) whether Barnette may credit the restitution that he allegedly paid, pursuant to a District Court criminal sentence, against his fraud additions to tax; (13) whether Barnette is entitled to a $ 7 million loss deduction for 1985; (14) whether Barnette and Ms. Barnette failed to report capital gain on their 1985 separate returns arising out of the disposition of Old Dominion Insurance Co. (Old Dominion *393 of Florida) stock; and (15) whether respondent erred in determining that additions to tax for substantial understatement pursuant to section 6661 applied to Barnette and Ms. Barnette's 1983 and 1984 joint returns, Allied's fiscal year ended May 31, 1984 and 1985 returns, Barnette and Ms. Barnette's 1985 separate returns, and the separate 1984 and 1985 returns of Leo D. and Janet L. Barnette. FINDINGS OF FACT Some of the facts have been stipulated and are so found. A conclusion of law has been stipulated; it has been ignored. King v. United States, 641 F.2d 253 (5th Cir. 1981); Godlewski v. Commissioner, 90 T.C. 200 (1988). *394 The stipulations of fact and accompanying exhibits are incorporated herein by this reference. A. The Parties
Petitioners Barnette and Ms. Barnette, husband and wife, resided in Jacksonville, Florida, at the time they filed all of their petitions herein. [4] They timely filed joint Federal income tax returns for all years in issue except 1985, in which they each timely filed a separate return. Petitioners Leo D. and Janet L. Barnette both resided in Jacksonville, Florida, at the time they filed their petitions. They are the children of Barnette and Ms. Barnette. Leo D. and Janet L. Barnette, as well as their parents, each filed their returns on the basis of the calendar year and used the cash method of accounting. Petitioner Allied is a Delaware corporation and had its principal office in Jacksonville, Florida, *395 at the time it filed its petitions. At all times during the calendar years 1976 through 1986, Barnette owned in excess of 95 percent, but less than all, of the capital stock of Allied and was its president. Barnette, Ms. Barnette, and one other person served as its directors. J.E.T.S. and Jets Services, both incorporated in Florida, were wholly owned subsidiaries of Allied. For all the years at issue, J.E.T.S. and Jets Services were included in the consolidated income tax returns filed by Allied. Allied, as well as each of the subsidiaries included on its consolidated returns, filed its returns on the basis of a fiscal year ended May 31 and used the accrual method of accounting. B. Background
During the early 1970's, Allied entered the business of Government contracting, particularly those contracts that called for services of a simple and often menial nature. Thereafter, Government contracting constituted virtually all of its business. Allied, under Barnette's direction, normally bid for and performed the contracts through J.E.T.S. or Jets Services. The majority of these contracts were with various components of the United States Government. During the mid-1970's, *396 Allied obtained virtually all of its Government contracts through small business set-asides as defined by statute. See 15 U.S.C.A. sec. 632 (1976). Allied and its subsidiaries employed managers to supervise the performance of the Government contracts, but the only persons with any managerial responsibility for the business as a whole were Barnette and one assistant. In several of these contracts, Allied encountered difficulties with the Department of Labor in maintaining its qualification to administer these contracts. C. The West German Laundry Contracts
After World War II, and until 1977, the United States Army operated seven laundry and dry cleaning plants in the Federal Republic of Germany (excluding Berlin) that served the Army and various other NATO forces in what was then known as West Germany. However, on April 15, 1976, the Army solicited bids from private contractors to operate and manage any or all of the plants for the 12-month period from October 1976 through September 1977. The solicitation required the contractor to "comply with all laws, regulations, directives and procedures of the Government of the Federal Republic of Germany * * * which are applicable *397 in operating and managing the US Army Laundry/Dry Cleaning Plants". 1. JETS Wascherei
On May 31, 1976, J.E.T.S. submitted a bid to operate all seven laundry and dry cleaning plants. On June 17, 1976, the Army inquired whether J.E.T.S. was authorized to do business in West Germany. Under the law of the Federal Republic of Germany it was illegal for a corporation incorporated outside the country to do business in the Federal Republic if it did not qualify to do business under West German law. Barnette sought the advice of a West German lawyer, who advised him that a U.S. corporation could qualify to do business in West Germany, but the quicker and more customary solution was to form a Gesellschaft mit beschrankter Haftung (GmbH) as a subsidiary to conduct the West German business. A GmbH is a juridical entity under West German law. On June 21, 1976, counsel for J.E.T.S. advised the Army that J.E.T.S. intended to comply with the requirement to become authorized to do business in West Germany by forming a GmbH. On June 30, 1976, JETS Wascherei was organized as a GmbH under the law of the Federal Republic of Germany, with unlimited life. On June 30, 1976, J.E.T.S. sent a *398 letter to the Army stating that JETS Wascherei was a wholly owned subsidiary of J.E.T.S. and that J.E.T.S. "hereby accepts any and all liabilities of its subsidiary to the United States Federal Government" under the proposed contract. The letter also requested that the contract be awarded in the name of JETS Wascherei. The Army, however, was concerned about awarding the contract in JETS Wascherei's name alone since the Army had prepared its preaward survey on J.E.T.S. The preaward survey had looked at the areas of technical, manpower, and financial capabilities of the persons submitting the bids. The Army's contracting personnel determined that the Army should accept the J.E.T.S. bid. In July 1976, Barnette agreed with the Army contracting office's request that the contract be awarded in the name of J.E.T.S. "doing business in Germany as Jets Wascherei GmbH". The contract, however, was not awarded at that time. West German labor unions drew the Army's attention to the fact that section 613(a) of the German Civil Code would apply to the transfer of operation and management of the seven laundry and dry cleaning plants. In August 1976, the Army amended its solication for bids *399 to incorporate information on what the contractor's obligations would be under section 613(a) of the German Civil Code and sent the amended solicitation out to various firms for a fresh round of bids. Because of the delay, the starting date of the contract was postponed, so that the contract was shortened to 9 months, commencing January 1, 1977. J.E.T.S. made the lowest qualifying bid. The contract was signed on November 15, 1976, and the contractor was shown on the signature page as: J.E.T.S. Inc. 2721 Park Street Jacksonville, Fla. 32205 (licensed to do business in the Federal Republic) (of Germany as JETS Wascherei G.m.b.H.) 2. Scale and Nature of West German Laundry and Dry Cleaning Operations
Pursuant to the contract, the Army provided its existing laundry and dry cleaning plants and equipment to the contractor for its operations. The Army leased the plants from the West German Government. Most, but not all, were located on Army bases. All laundry, dry cleaning, and other services rendered to the Army and other NATO forces during 1977 through 1981 were performed by persons who were employees of JETS Wascherei. JETS Wascherei established and maintained payroll *400 records for its employees in accordance with West German requirements and practices. At the inception of the contract, JETS Wascherei had about 800 employees. Barnette recruited and hired about a dozen managers from the United States for the West German laundry and dry cleaning operations. It was necessary, or at least desirable, for the U.S. managers to have privileges under the Status of Forces Agreements, which required that they be paid by a U.S. company. JETS Wascherei, as a West German company, could not qualify. Barnette initially put the U.S. managers on the payroll of J.E.T.S. During the years 1977 through 1981, JETS Wascherei maintained its own books and records separate from those of any other organization. JETS Wascherei established and kept a general ledger and other books of account, in a conventional format, on a substantially contemporaneous basis. On and after May 1, 1977, all invoices to the Army for laundry and dry cleaning services in West Germany were made in the name of JETS Wascherei. During 1977 through 1981, JETS Wascherei maintained various bank accounts in West Germany that it used for its business operations. After March 1977, all payments by *401 the Army for the operation of laundry and dry cleaning plants in the Federal Republic of Germany were made to bank accounts held in the name of JETS Wascherei. JETS Wascherei paid its own bills, with the exception of supplies. The West German laundry/dry cleaning contract was renewed several times for a year at a time. The final renewal was for 6 months and terminated on March 31, 1981. D. Hamilton Insurance Co. Ltd., and Markham Corp., S.A.
West German insurance companies were concerned about providing insurance coverage at U.S. installations in West Germany because of terrorist activity. Barnette retained a Gibraltar attorney to organize a Gibraltar insurance company under the name Hamilton Insurance Co. Ltd. (Hamilton Insurance). It was incorporated on February 18, 1977, and was capitalized with the equivalent of $ 17,152 of share capital. It was licensed as an insurance company by the Gibraltar authorities. Hamilton Insurance ostensibly provided insurance coverage to two persons: JETS Wascherei and Jets Boiler Services GmbH. [5] Gibraltar did not impose any substantial tax on Hamilton Insurance's earnings. Because JETS Wascherei deducted the funds it paid Hamilton *402 Insurance as insurance premiums, Hamilton Insurance served the purpose of reducing potential West German corporate profits tax on JETS Wascherei's earnings from the West German laundry and dry cleaning operations. In 1982, Hamilton Insurance rebated $ 2,006,354 of premiums to JETS Wascherei. Rather than own Hamilton Insurance directly, Barnette owned it through a Panamanian corporation called Markham Corp., S.A. Barnette owned all of the stock of Markham Corp., S.A. until May 1980, when he transferred it to Jets Services. E. Withdrawal of JETS Wascherei from the Allied Group
1. Old Dominion Corp., S.A.
Barnette wanted to transfer JETS Wascherei to a Panamanian corporation because he believed Panama would function as a tax haven; i.e., Panamanian taxes would not apply to income earned from the West German laundry and dry cleaning operations, or from investment activity. Through *403 his Panamanian lawyer, Barnette acquired Old Dominion, a corporation incorporated in Panama in 1975, which the lawyer had available as a "shelf" corporation. Barnette acquired effective ownership and control of Old Dominion in March 1977. Stock certificates in his name were signed in approximately May 1977, but were backdated to August 30, 1976. Barnette opened Old Dominion's first bank account on April 11, 1977, with a deposit of $ 1,200. Barnette had an agreement of sale and a promissory note prepared to transfer JETS Wascherei to Old Dominion. The documentation was signed in late March or early April 1977 and was also backdated to August 1976. The agreement of sale called for Old Dominion to pay J.E.T.S. $ 100,000 and for Old Dominion to reimburse J.E.T.S. for the expenses it incurred in obtaining the laundry contract. 2. World Management Services, Inc.
In June 1977, World Management Services, Inc. (World Management), began paying the dozen or so employees who had to be on a U.S. payroll to obtain Status of Forces privileges. World Management was a new corporation incorporated in Florida in May 1977. At all relevant times, Ms. Barnette owned all of the stock of World *404 Management. A payroll clerk employed by Jets Services continued to handle the payroll for the dozen or so employees who had been put on World Management's payroll. 3. Treatment of the Sale
Barnette revealed the transfer of JETS Wascherei to very few persons. He did not inform the Army of it until January 28, 1981. Until that time, Barnette led the Army to believe that J.E.T.S. continued to own JETS Wascherei. Additionally, the record has several instances where Barnette either implied or told persons that J.E.T.S. owned JETS Wascherei, or told persons of the transfer but did not inform them that he owned Old Dominion. However, Barnette did take steps recognizing the transfer. Around June 1977, Barnette notified the independent accountants for Allied that JETS Wascherei had been sold, and he gave them a copy of the agreement of sale. Allied's financial statements for its fiscal year ended May 31, 1977, were certified by its independent accountants on or about July 21, 1977. The financial statements showed a $ 100,000 gain on the "sale of affiliate". Allied's consolidated Federal income tax return for its fiscal year ended May 31, 1977, reported that the sale of "Allied *405 of Germany" resulted in a $ 100,000 long-term capital gain. The reference was apparently to JETS Wascherei. On November 15, 1977, Barnette executed a German language notarial deed to record a transfer of the ownership of JETS Wascherei from J.E.T.S. to Old Dominion. Under West German law, a notarial deed was the only way to transfer ownership of a GmbH. The notarial deed was a public record in West Germany, thus available for inspection by any interested party. JETS Wascherei filed West German corporate profits tax returns for tax years 1977 through 1980. Its returns for all those years showed Old Dominion as JETS Wascherei's only shareholder. Lists of the shareholders of JETS Wascherei as of January 1977, 1978, 1980, and 1981 were filed with the Commercial Register in Frankfurt, West Germany. Such lists were also public records in West Germany. The list filed for January 1977 showed J.E.T.S. as the sole shareholder of JETS Wascherei. The lists for 1978, 1980, and 1981 showed Old Dominion as the sole shareholder. F. Avoidance of West German Taxes
Barnette sought the services of Price Waterhouse & Co. concerning the possible tax consequences involved with the laundry *406 contract. JETS Wascherei was a corporation for purposes of West German law and taxation. Barnette took a number of measures to avoid or minimize West German corporate profits tax. First, a license agreement between JETS Wascherei and Old Dominion provided for JETS Wascherei to pay 7 percent of its gross receipts to Old Dominion. Secondly, a profit guarantee agreement between JETS Wascherei and Old Dominion originally provided for Old Dominion to guarantee JETS Wascherei a profit of DM 20,000 per year, in return for which Old Dominion was to receive all of the profits under the West German laundry contract. In June 1977, the profit guarantee agreement was amended so that JETS Wascherei was guaranteed a profit equal to 4 percent of labor costs. Thirdly, Old Dominion purchased detergent and other supplies and resold them to JETS Wascherei at a large markup, over twice the price paid to the unrelated supplier. Barnette prepared invoices from Old Dominion to JETS Wascherei to reflect such sales. G. Bonding Fee
During 1980, Barnette and Robert P. Rupert (Rupert) agreed to serve as individual sureties on a bond for J.E.T.S. that was required for a Government contract. They *407 agreed that the bonding fee would be $ 103,650, which they would split equally and use to capitalize a new leasing company named Mayfair Leasing, Inc. J.E.T.S. paid the bonding fee with a check payable to the order of Barnette and Rupert. Barnette endorsed the check and sent it to Rupert, who endorsed it and deposited it in the account of Mayfair Leasing, Inc. Barnette was treated, initially, as a 50-percent stockholder in Mayfair Leasing, Inc. In 1981, before filing his 1980 return, Barnette told Rupert that he wanted to give up his stock in Mayfair Leasing, Inc., and they agreed that he would no longer have an interest. Rupert reported $ 51,825 of bonding fee income on his 1980 tax return and another $ 51,825 on his 1981 return. H. Issuance of Preferred Stock by Old Dominion
In December 1980, Old Dominion amended its Articles of Incorporation to authorize a class of preferred stock. It was known at that time that the West German laundry contract would end on March 31, 1981. Under the December 1980 charter amendment, the terms of the preferred stock were as follows: 1. Dividends. (A) Each share of the preferred stock that is outstanding at the end of any calendar *408 year (including the year such share is issued) shall be entitled to receive a dividend equal in value to nine percent of the liquidation preference of such share determined as of the end of such year, out of the earnings of the Corporation for such year legally available therefor. * * * (B) * * * In the event that the Board of Directors declares a dividend that exceeds the cumulative unpaid dividend rights of the preferred stock under paragraph 1(A) of this article at the time such dividend is declared (not including the dividend right of the preferred stock for the year during which such dividend is declared), the excess shall be applied in reduction of the liquidation preference of the shares with respect to which such dividend is declared. * * * (C) No dividends may be declared or paid on the common stock at a time when any of the preferred stock is outstanding. * * * 4. Dissolution. * * * For all purposes of this article the liquidation preference of each share of preferred stock shall be the sum of (I) one thousand dollars plus (II) any declared but unpaid dividends on such share plus (III) any undeclared dividends to which such share is entitled under paragraph 1(A) *409 of this article, reduced by (IV) any reduction pursuant to Paragraph 1(B) of this article. Between December 24 and 26, 1980, the following occurred: Old Dominion issued a stock warrant to Barnette for 3,000 shares of preferred stock at $ 1 per share; Barnette promptly exercised the warrant, so that Old Dominion issued 3,000 shares of preferred stock to him for $ 3,000; Barnette then transferred 100 shares of (10 percent of the outstanding) common stock and 3,000 shares of (100 percent of the outstanding) preferred stock in Old Dominion to Allied as a contribution to capital; Allied then transferred those shares in Old Dominion to Jets Services as a contribution to capital. Barnette timely reported all of the foregoing transfers. Jets Services owned the 3,000 shares of preferred stock and 100 shares of common stock in Old Dominion from December 1980 until they were redeemed in January 1985. Jets Services claimed a basis of $ 3,000 in the preferred stock. Barnette held the remaining 900 shares of common stock until August 19, 1983. Allied's consolidated financial statements for its years ended May 31, 1981 and 1982 included on the balance sheets as investments the Old Dominion *410 common and preferred stock contributed to it by Barnette. Allied recorded the contribution on its books at $ 1 million for the preferred stock and $ 400,000 for the common stock. Valuing the Old Dominion preferred and common stock together at $ 1.4 million increased Allied's book net worth at May 31, 1981, to $ 5.6 million. Old Dominion made distributions on its preferred stock as follows: Calendar Year
Amount Distributed
1980
$ 330,773
1981
750,000
1982
-0-  1983
226,800
1984
-0-  The $ 330,773 distribution in 1980 was made to Jets Services. On the consolidated return for its fiscal year ended May 31, 1981, Allied reported $ 356,597 of income under subpart F from Old Dominion. Because this amount exceeded the $ 330,773 that was distributed, Allied reported itself as taxable on the larger amount. In 1981, JETS Wascherei began the process of liquidation in accordance with West German procedures. I. Initiation of Respondent's Audit
In March 1980, JETS Wascherei received notice from the West German authorities that its returns were to be audited. In May 1980, respondent conducted an office audit of Barnette and Ms. Barnette's joint tax return for *411 1978. The only item examined was $ 202,769 from an assignment of a Currency Exchange Guarantee that Barnette had reported as long-term capital gain. [6] On June 5, 1980, respondent issued a "no change" letter to the Barnettes for 1978. On July 24, 1980, Barnette retained Price Waterhouse & Co.'s Jacksonville office for the purpose, inter alia, of preparing "all necessary federal income tax disclosure statements and tax returns or amended returns, including to the extent required Forms 957, 958, 959, 2952 and 3646." At that time, Price Waterhouse & Co. was told of the existence and ownership of Old Dominion, Hamilton Insurance, and Markham Corp., S.A., and that Old Dominion owned JETS Wascherei. Old Dominion, Hamilton Insurance, and Markham Corp., S.A., had not established formal books of account. Price Waterhouse & Co. established the *412 books of account of those entities on the basis of the calendar year and using the accrual method of accounting. The present consolidated cases commenced with an audit notice dated July 25, 1980, to World Management. On October 14, 1980, Price Waterhouse & Co., on behalf of petitioners Barnette and Ms. Barnette, submitted amended returns for 1976, 1977, 1978, and 1979 to the revenue agent assigned to audit World Management. The amended returns indicated that there was no additional liability for tax. The amended returns for 1977, 1978, and 1979 included balance sheets and statements of income for each of the three foreign corporations. Those returns also disclosed the existence of JETS Wascherei and disclosed that it was being treated as a branch of Old Dominion. Allied timely filed its return for its year ended May 31, 1980, in November 1980. Allied's 1980 return included a statement noting that the disclosure Forms 2952 for Markham Corp., S.A., and Hamilton Insurance were to be filed by Barnette and Ms. Barnette. As the result of the disclosures made by petitioners in 1980, an international specialist was assigned to the case in February 1981. In March 1981, the audit of *413 World Management was extended to Allied and in April 1981 to the Barnettes personally. In July 1981, while respondent's audit was underway, Barnette filed Form 90-22.1 to report his interest in foreign bank accounts for the calendar year 1980. A statement attached to the form identified JETS Wascherei, Hamilton Insurance, Markham Corp., and Old Dominion, and gave the names, addresses, and account numbers of their various foreign bank accounts. Also during the course of the audit, Barnette furnished the international specialist with copies of the West German laundry contract, the license agreement between JETS Wascherei and Old Dominion, supply invoices from Old Dominion, and various other documentation. J. The Period in 1983 and Thereafter
As of August 1983, Barnette owned 90 percent of the common stock of Old Dominion. On August 19, 1983, he transferred shares totaling 80 percent of the common stock to Ms. Barnette, and gave 5 percent of the common stock to each of his two children, petitioners Leo D. and Janet L. Barnette. On August 31, 1983, Barnette and Allied were indicted on a 25-count indictment in U.S. District Court in Jacksonville, Florida. The gravamen of *414 the indictment was Government contract fraud. On July 19, 1984, a jury found Barnette guilty on 15 of the counts related to the Government contract fraud, and not guilty on two counts. The District Court granted judgments of acquittal on four other counts. The indictment had also charged Barnette with three counts of tax fraud (section 7201) on his personal income tax returns for 1977, 1978, and 1979. The jury found him guilty for 1978 and 1979, but not guilty for 1977. Barnette concedes that he is collaterally estopped in this proceeding from contesting the fraud issue for 1978 and 1979. Allied was also indicted for tax evasion, but the charges were dismissed by the District Court. On November 5, 1984, the District Court sentenced Barnette to concurrent terms of 5 years' imprisonment. The prison terms were imposed with respect to, inter alia, false and fraudulent U.S. income tax returns under title 26 of the United States Code. The District Court ordered Barnette to make restitution to the Army in the amount of $ 7 million for profits earned under the West German laundry contract. The restitution order also encompassed the counts of conspiracy, bribery, mail fraud, false *415 statements, and RICO under title 18 of the United States Code. The restitution was to be paid within the first year of his confinement. Allied was found guilty on all counts for which the District Court required Barnette to make restitution. On November 7, 1984, Barnette filed a motion to modify the restitution order in several respects, including a request that any funds collected by the United States pursuant to tax assessments against Allied or the Barnettes on account of income earned pursuant to the West German laundry contract be credited against the restitution. On November 17, 1984, the District Court entered an order that denied "at this time" a credit against restitution for payments of tax. On November 13, 1984, Barnette filed a motion with the District Court to stay his sentence pending an appeal. On December 13, 1984, the District Court granted a stay of execution pending appeal "conditioned on the defendant posting by January 10, 1985, either the ordered restitution in the amount of $ 7 million with the Clerk of the Court * * * or a bond in an equivalent amount." In order to raise part of the $ 7 million, Barnette proposed that Allied borrow $ 3,625,000 from Old *416 Dominion for Barnette's use in making bond. On January 9, 1985, Allied, J.E.T.S., and Jets Services (but not Jets Venture Capital Corp.) all adopted plans of liquidation. They all filed Forms 966 later that month to report the adoption of the plans. On January 9, 1985, Allied obtained $ 6,484,504 from Old Dominion and Hamilton Insurance as follows: (1) Old Dominion paid Jets Services $ 2,400,000 in redemption of all of the shares of Old Dominion common and preferred stock held by it; (2) Hamilton Insurance and its parent, Markham Corp., S.A., paid $ 459,504 to Allied as distributions in informal liquidation of those entities; and (3) Old Dominion loaned [7] $ 3,625,000 to Allied. Allied issued a promissory note to Old Dominion in the face amount of $ 3,625,000 due and payable on January 6, 1986, and providing for interest at an annual rate of 13 percent. Old Dominion executed a security agreement reciting various assets of Allied and its subsidiaries, which would stand as security for the loan of $ 3,625,000. The security consisted of 98 percent of the stock in Jets Venture Capital Corp., a mortgage note for $ 1,125,000 from an unrelated party, a note for $ 30,037.50 from the *417 same party, and a note for $ 425,000 from Jets Venture Capital Corp. In addition to the $ 6,484,504 obtained from Old Dominion and Hamilton Insurance, Allied obtained $ 510,000 from its own preexisting liquid assets and $ 6,600 from a loan from Barnette. It made $ 7,000,914 available to Barnette to post the $ 7 million bond, plus miscellaneous fees. The record does not disclose whether this distribution was made as a dividend, or loan, or something else. On January 10, 1985, $ 7 million was deposited with the clerk of the District Court. On April 2, 1985, Jets Services made a payment to Old Dominion of $ 31,839.75 in interest on the $ 3,625,000 note. In May 1985, the United States filed suit (1985 Civil Action) in the United States District Court for the *418 Middle District of Florida against Barnette, Ms. Barnette, Allied, and others, seeking damages in excess of $ 45,000,000 under the RICO statutes, 18 U.S.C. sec. 1964(b) and (c) (1988), the False Claims Act, 31 U.S.C. secs. 3729-3731 (1988), and other causes of action. The Government initiated various other legal proceedings aimed at seizing any and all assets of Barnette and his interests. Allied's $ 3,625,000 promissory note to Old Dominion purportedly matured on January 6, 1986, which was within 1 year after it was incurred. As of January 6, 1986, the appeal of Barnette's conviction had not been decided, and the $ 7 million bond remained in the registry of the District Court. The District Court credited interest earned on the note from January 10, 1985, to January 9, 1986, to Barnette. Allied did not repay the loan at its purported maturity, and has never made any payments of principal on the loan. Allied filed its return for its fiscal year ending May 31, 1985, on February 18, 1986, claiming a deduction for the $ 7 million that had been posted as a bond. Allied took the deduction on the grounds that the bond was posted as bond for restitution and not merely as an appearance *419 bond. In October 1986, the Eleventh Circuit affirmed the convictions of Barnette and Allied. United States v. Barnette, 800 F.2d 1558 (11th Cir. 1986). On appeal, it was held that there was no statutory authority to order restitution on one of the bribery counts. The full $ 7 million in restitution was authorized on the other counts under what was then 18 U.S.C. section 3579, enacted by Pub. L. 97-291, 96 Stat. 1253, recodified with amendments not relevant here as 18 U.S.C. sec. 3663 (1988). United States v. Barnette, supra at 1570-1571. Barnette reported to prison in December 1986. Barnette served 33 months in prison. In July 1990, Barnette filed a motion with the District Court for, inter alia, the restitution to be a credit against Barnette's possible tax liabilities. The District Court has never acted on that aspect of the motion. After further proceedings relating to the $ 7 million, the disposition of interest earned on that amount, and the interplay of the forfeiture judgment and the obligation to pay restitution, the $ 7 million was disbursed to the Government, pursuant to an order of the District Court entered in February *420 1991. K. The Sale of Old Dominion of Florida
Old Dominion Insurance Co. (Old Dominion of Florida) was a Florida corporation that was incorporated in April 1981. It was licensed as an insurance company in Florida. From 1981 until 1985, Barnette and Ms. Barnette owned all of its stock. The Department of Justice named Old Dominion of Florida as one of the defendants in the 1985 Civil Action that it filed in May 1985. The Department of Justice drew the attention of the Florida insurance authorities to the 1985 Civil Action. On July 17, 1985, the Florida insurance authorities filed suit against Old Dominion of Florida, seeking to enjoin it from continuing business and to seize its assets. Barnette and Ms. Barnette obtained a potential buyer for their stock in Old Dominion of Florida, but the buyer was unwilling to buy the stock unless the Government dismissed its suit. The Government was unwilling to agree to dismiss the suit unless the proceeds were paid into court. In July 1985, Barnette and Ms. Barnette sold Old Dominion of Florida. The sales proceeds were $ 783,617.71, but the Barnettes never actually received them (nor did they receive any of the interest accrued *421 on the earnest money). By agreement between the Barnettes and the Department of Justice, the proceeds of the sale of Old Dominion of Florida (including accrued interest on the earnest money) were paid into the registry of the District Court. The agreement was ultimately reflected in a court order pursuant to the parties' stipulation filed in the District Court on April 30, 1986. In return, the Government dropped a motion for civil arrest that it had filed against Barnette in July 1985 in the 1985 Civil Action. The disposition of the funds paid into the registry of the District Court depends on the ultimate resolution of the 1985 Civil Action, which is still unresolved. L. Additional Facts
None of Ms. Barnette's separate income for years 1977 through 1980 is at issue. Respondent has stipulated that no part of any deficiency for any of the years at issue is attributable to fraud on Ms. Barnette's part. Ms. Barnette was not aware of all the intricacies of her husband's business transactions. Although she was on Allied's Board of Directors, she rarely attended board meetings, and would sign the minutes when Barnette would present them to her. Ms. Barnette knew that JETS *422 Wascherei was performing the West German laundry contract and knew that Barnette had purportedly transferred JETS Wascherei from J.E.T.S. to Old Dominion. She also knew that Barnette owned Old Dominion. On or about February 19, 1983, Barnette and Ms. Barnette separated. They divided their assets, whereby Barnette kept Allied and its subsidiaries, and Ms. Barnette, Leo D., and Janet L. Barnette received Old Dominion in August. Barnette and Ms. Barnette both retained shares in Old Dominion of Florida. Since their separation in February 1983, Barnette and Ms. Barnette have maintained separate residences. The returns filed by Barnette for the years 1977, 1978, and 1979 were fraudulent within the meaning of section 6653(b). OPINION Issue 1. Branch or Subsidiary
Prior to determining the substantive issues in these consolidated cases, we first address the parties' stipulation that "JETS Wascherei was not operated as a corporation or association under U.S. tax law, and should therefore be treated for U.S. income tax purposes as a branch." This stipulation is a conclusion of law which this Court is not bound to accept as controlling. Estate of Sanford v. Commissioner, 308 U.S. 39, 51 (1939); *423 Saviano v. Commissioner, 765 F.2d 643, 645 (7th Cir. 1985), affg. 80 T.C. 955 (1983); Ohio Clover Leaf Dairy Co. v. Commissioner, 8 B.T.A. 1249, 1256 (1927), affd. 34 F.2d 1022 (6th Cir. 1929). Further, the parties' intent as to the effect of this stipulation is ambiguous since several of the issues they raise herein require a determination as to whether JETS Wascherei will be recognized as a separate corporation (i.e., capable of owning property, earning income, and having earnings and profits). We believe that JETS Wascherei must be considered either a branch or a subsidiary for tax purposes, not a combination of both. Cf. National Carbide Corp. v. Commissioner, 336 U.S. 422, 429-430 (1949). We therefore reject the parties' stipulation and undertake to determine which form of business it most closely resembled. The same standards used to determine the status of a domestic organization are used to determine the status of a foreign organization. See Biddle v. Commissioner, 302 U.S. 573 (1938). In this regard, local law governs the legal relationships established in *424 the formation of the organization. Sec. 301.7701-1(c), Proced. & Admin. Regs. Federal law standards are then applied in classifying the organization; it will be taxed as a corporation if its characteristics more closely resemble that organizational form than a partnership or a trust. Morrissey v. Commissioner, 296 U.S. 344 (1935). The regulations list six characteristics that distinguish corporations, for tax purposes, from other organizational forms. Sec. 301.7701-2(a)(1), Proced. & Admin. Regs. The first two characteristics, "associates" and "an objective to carry on business for joint profit", are essential for all organizations engaged in business for profit "other than the so-called one-man corporation and the sole proprietorship". Sec. 301.7701-2(a)(2), Proced. & Admin. Regs. As we note below, we believe JETS Wascherei was engaged in business for profit. Since the absence of "associates" and an objective to carry on a business for "joint" profit are common to both one-man corporations and sole proprietorships, we hold that JETS Wascherei, as a juridical entity, will be considered a corporation in form if it had at least three of the following four *425 characteristics: (1) Liability for corporate debts limited to corporate property; (2) centralization of management; (3) continuity of life; and (4) free transferability of interests. Cf. sec. 301.7701-2(a)(2), Proced. & Admin. Regs. JETS Wascherei had the first three characteristics since, under West German law, the liability for its debts was limited to its capital, it had centralization of management, and unlimited life. Rule 146; see Meister, "The Limited Liability Company", 2 Business Transactions in Germany (FRG), secs. 23.02[5][d], 23.02[6][a], 23.04[1][a] (Ruster ed. 1991). As for the third characteristic, a GmbH's articles of incorporation can specify reasons that will cause its dissolution. In the instant matter, however, JETS Wascherei's articles did not provide that the death, insanity, bankruptcy, retirement, resignation, or expulsion of any of its members would compel its dissolution. See sec. 301.7701-2(b)(1), Proced. & Admin. Regs. Consequently, we hold that it had continuity of life. Finally, although JETS Wascherei's articles did provide that a sale of shares "shall be allowed only with the authorization of the corporation", we believe that it had free transferability *426 of interests here since it was wholly owned and West German law recognized the transfer of it from J.E.T.S. to Old Dominion. Accordingly, in its essential characteristics JETS Wascherei was a corporation and should be treated as such for U.S. tax purposes. [8]
If a corporation is formed for a business purpose, or if it carries on business after incorporation, its corporate form must be recognized for tax purposes. Moline Properties, Inc. v. Commissioner, 319 U.S. 436, 438-39 (1943). On the other hand, if a corporation is unreal or is a sham, its corporate form must be disregarded for tax purposes. Higgins v. Smith, 308 U.S. 473 (1940). Normally, a valid business purpose, and hence separate entity status, will be found where a corporation is *427 organized to comply with foreign law. Elot H. Raffety Farms, Inc. v. United States, 511 F.2d 1234 (8th Cir. 1975). In the instant matter, West German law required that a U.S. corporation be qualified to do business in West German, and the record is clear that the Army, prior to awarding the contract, was concerned about J.E.T.S.' ability to satisfy West German law. Consequently, J.E.T.S. formed a wholly owned GmbH. While J.E.T.S. was not required per se to form a GmbH in order to qualify to do business in West Germany, evidence was received that this was the quickest and most customary solution. Based on these circumstances, we hold that JETS Wascherei was formed for a valid business purpose. We also hold that JETS Wascherei was actively engaged in a trade or business and was not the mere alter ego of its owner. During 1977 through 1981, JETS Wascherei maintained its own books and records separate from those of any other organization including Allied and J.E.T.S. During those same years, JETS Wascherei maintained various bank accounts in West Germany. On and after May 1, 1977, all invoices to the Army for laundry and dry cleaning services in West Germany *428 were made in the name of JETS Wascherei. Finally, the parties have stipulated that all laundry, dry cleaning, and other services rendered to the Army during 1977 through 1981 were performed by persons who were employees of JETS Wascherei. Merely because JETS Wascherei was wholly owned will not prevent it from being recognized as a separate corporate entity. Cf. Moline Properties, Inc. v. Commissioner, supra. Under the circumstances present in this case, we hold that JETS Wascherei's status as a "separate corporate entity cannot be ignored." Columbian Rope Co. v. Commissioner, 42 T.C. 800, 813 (1964). Issue 2. Inclusion of West German Laundry Profits On Allied's Consolidated Returns
The second issue we consider is whether respondent erred in determining that Allied failed properly to include the profits from the West German laundry contract on its consolidated returns for the fiscal year ending May 31, 1977, through May 31, 1981. Petitioners claim that the profits were not reportable on Allied's consolidated returns because JETS Wascherei earned the profits and JETS Wascherei was transferred outside the Allied group to Old Dominion. *429 Conversely, respondent argues that the West German laundry contract was awarded to and was owned by J.E.T.S. throughout the years at issue so that J.E.T.S. was the true earner of these profits. Respondent further contends that Allied should therefore have reported that income since J.E.T.S. filed consolidated returns with it. We summarize the facts leading up to the award of the contracts. Subsequent to J.E.T.S.' initial bid on the laundry contract, the Army asked J.E.T.S. whether it was authorized to do business in West Germany as required by West German law. In response, J.E.T.S. formed JETS Wascherei and, on June 30, 1976, sent a letter to the Army stating that JETS Wascherei was a wholly owned subsidiary of it and that J.E.T.S. "hereby accepts any and all liabilities of its subsidiary" under the proposed contract. The letter also requested that the contract be awarded in the name of JETS Wascherei. The Army was concerned about awarding the contract in JETS Wascherei's name alone because the preaward survey had been done on J.E.T.S. In July 1976, Barnette agreed to the contract being awarded to J.E.T.S. "doing" business in West Germany as JETS Wascherei. Due to concerns *430 raised by the West German labor unions, however, the contract was not awarded at that time. In August 1976, the Army asked for a fresh round of bids incorporating the contractor's obligations under section 613(a) of the German Civil Code. Again J.E.T.S. made the lowest qualifying bid and on November 15, 1976, the contract was awarded to J.E.T.S. "licensed" to do business in West Germany as JETS Wascherei. Both parties claim that these facts support their respective arguments. Respondent claims that all the objective factors show that it was intended that the contract be between J.E.T.S. and the Army, and that the Army rejected Barnette's request to award the contract to JETS Wascherei. Petitioners claim that the facts were more complex than submitted by respondent in that the Army knew it was dealing with two separate entities. They state that "If the Army awarded the contract to JETS Wascherei, it would be awarding the contract to an entity that had not submitted the bid. If the Army awarded the contract to [J.E.T.S.], they would be awarding it to an entity that could not legally perform it." Petitioners claim that the facts show a gradual evolution in the Army's thinking *431 and that the contract was styled as it was only to satisfy the Army's paperwork requirements. They claim that the only rational conclusion is that both entities were parties to the contract: JETS Wascherei was the company required to perform it; and J.E.T.S. served as guarantor. We agree with petitioners' contention that the Army contemplated the involvement of JETS Wascherei, as well as J.E.T.S., when awarding the contract. In this respect, it appears that the Army would not have awarded the contract without evidence that it could be legally performed. The evidence clearly shows that JETS Wascherei was created to perform the laundry contract and, as an entity separate from JETS Wascherei, J.E.T.S. itself could not legally perform it. Nonetheless, we reject petitioners' claim that J.E.T.S. was merely a guarantor of the contract. When a contract is ambiguous, we must look at the intent of the parties, and we believe the Army was not willing to make J.E.T.S. secondarily liable. See O'Neill v. Corporate Trustees, 376 F.2d 818 (5th Cir. 1967). We believe that the Army and Barnette agreed that J.E.T.S. would be primarily responsible for the performance of the *432 contract despite the fact that J.E.T.S. itself could not perform it. In this respect, the Army awarded the contract to J.E.T.S. since it owned JETS Wascherei which could perform it. Accordingly, we agree with respondent's contention that the contract was owned by and was the property of J.E.T.S. Merely because J.E.T.S. owned the contract, however, is not a basis to attribute the laundry contract profits to J.E.T.S. "The contracts themselves did not produce the income -- it was the work performed that did so." Nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601, 620 (1964). JETS Wascherei performed the work that gave rise to this income and is therefore taxable on it. Indeed, the parties have stipulated that JETS Wascherei earned the income from the laundry and dry cleaning operations for the U.S. Army in the Federal Republic of Germany during 1977 through 1981. Since J.E.T.S. was not authorized to conduct business in West Germany, did not perform the contract, and did not receive any of the income, none of the profits were allocable to J.E.T.S. Cf. Commissioner v. First Security Bank of Utah, 405 U.S. 394 (1972); Salyersville National Bank v. United States, 613 F.2d 650 (6th Cir. 1980); *433 Procter & Gamble Co. v. Commissioner, 95 T.C. 323 (1990), affd.    F.2d     (6th Cir., Apr. 20, 1992). As a foreign corporation, JETS Wascherei could not be included in Allied's consolidated returns. Secs. 1501, 1504(a) and (b)(3). Whether or not J.E.T.S. owned JETS Wascherei, the profits from the West German laundry contracts were not reportable on Allied's consolidated returns for the years 1978 through 1981. We therefore hold for petitioners on this issue. Having made this determination, we hold that the various payments made by JETS Wascherei to Old Dominion and Hamilton Insurance did not result in constructive dividends from Allied to Barnette. Likewise, we hold that the rebate of premiums from Hamilton Insurance to JETS Wascherei in 1982 was not income to Allied. Issue 3. Transfer of JETS Wascherei
The third issue we decide (related to the above) is whether the transfer of JETS Wascherei from J.E.T.S. to Old Dominion should be recognized for tax purposes. Although Barnette concedes that he backdated the documents relating to this transfer, expert testimony was received that the transfer was valid under West German law. Rule 146. *434 Respondent contends that the transfer should be ignored for tax purposes because it occurred in form only; in reality it lacked substance and was therefore a "sham" sale. A sham transaction has been defined by the Court as "the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). This Court has often used a two-prong economic substance/business purpose test to determine whether a transaction should be considered a sham. E.g., Cherin v. Commissioner, 89 T.C. 986 (1987); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985). The parties' arguments on this issue essentially address that test. Respondent argues that the sale should be disregarded because the sole purpose of the transfer of JETS Wascherei to Old Dominion was to channel the profits of the West German laundry contract to a foreign corporation in an attempt to evade U.S. tax. Petitioners argue that the transfer *435 of JETS Wascherei from J.E.T.S. to Old Dominion had a business purpose in that Barnette wanted to get JETS Wascherei out of the Allied group so as to protect JETS Wascherei from debarment by the Department of Labor. In this respect, Barnette testified that he was told in early 1977 by a labor union official that the Department of Labor was secretly seeking to debar his companies, as opposed to the corporate officers, for violations of the Service Contract Act. Barnette testified that he also thought that a transfer of JETS Wascherei would preserve Allied's qualification for small business set-asides. Given the past history of Allied's troubles with the Department of Labor, which appears in this record, we find this testimony credible. Petitioners further argue that the sale had economic substance in that all the profits went to Old Dominion rather than to Allied or any of its subsidiaries. On the other hand, respondent contends that Barnette did not know that the Department of Labor was secretly seeking debarment, and that Barnette knew that Allied was not eligible for small business set-asides even if JETS Wascherei were owned by Old Dominion. As noted above, the West German *436 laundry profits were not reportable by J.E.T.S. whether or not it owned JETS Wascherei. Consequently, we are asked to determine whether the transfer of JETS Wascherei should be disregarded as a sham where, at most, there was only a subjective belief on J.E.T.S.' part that taxes could be avoided. In reality, taxes were not avoided even if there was a transfer. Although Barnette was selective as to whom he told about the transfer, ownership can be secret and still be effective for tax purposes. See Evans v. Commissioner, 447 F.2d 547 (7th Cir. 1971), affg. 54 T.C. 40 (1970); Ross Glove Co. v. Commissioner, 60 T.C. 569 (1973). We have found that the transfer took place on November 15, 1977. Based on the circumstances present in this case, we believe the transfer should be respected. Issue 4. Subpart F for 1977 through 1980
As an alternative to including the laundry profits in Allied's income, respondent determined that an amount equal to the West German laundry profits was reportable by Barnette for years 1977 through 1979 under section 951 as subpart F income from a controlled foreign corporation. Respondent asserts *437 that Barnette had deemed dividends in that amount since he owned 100 percent of Old Dominion's stock and it owned JETS Wascherei (which, as noted above, the parties stipulated was to be treated as a branch). In an amendment to answer, respondent made the same allegation for 1980. Prior to the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, which added subpart F, secs. 951-964, a shareholder of a foreign corporation was not subject to U.S. tax on its income earned outside the United States, unless the foreign personal holding company provisions, secs. 551-558, were applicable. Vetco, Inc. v. Commissioner, 95 T.C. 579, 585 (1990). Subpart F was enacted to impose limitations on the ability of U.S. taxpayers to use foreign corporations to defer taxes. For the years at issue, section 951 required each shareholder of a controlled foreign corporation to include in income for the taxable year a pro rata share of the corporation's subpart F income. Sec. 951(a)(1)(A)(i). Under section 952, subpart F income included, inter alia, foreign base company income as determined under section 954. Sec. 952(a)(2). Foreign base company income included the sum of, inter alia, *438 foreign personal holding company income and foreign base company services income. Sec. 954(a)(1), (3). Foreign personal holding company income, for purposes of section 954(a)(1), is defined as foreign personal holding company income for purposes of section 553 with certain modifications. Sec. 954(c)(1). None of those modifications are applicable in the instant matter. See sec. 954(c)(2), (3), and (4). Consequently, foreign personal holding company income in this case is the same for purposes of subpart F as it is for purposes of the foreign personal holding company provisions, and means, inter alia, the portion of gross income which consists of dividends, interest, and royalties. Sec. 553(a)(1). For years 1977 through 1980, the foreign personal holding company provisions took precedence over the subpart F provisions when amounts were includable under both. Sec. 951(d). [9]
*439 In the instant matter, the parties agree that the interest earned by Old Dominion on the amounts paid to it by JETS Wascherei constituted foreign personal holding company income. See sec. 553(a)(1). They disagree on whether that income was taxable currently, which is dependent on the proper treatment of the rest of Old Dominion's income. Both parties argued this issue assuming that all the West German laundry profits were income to Old Dominion since the parties had stipulated that JETS Wascherei was to be treated as a branch. Petitioners contend that Old Dominion's foreign personal holding company income was not taxable because that income was less than 10 percent of Old Dominion's total income and Old Dominion did not have any other foreign base company income. See sec. 954(b)(3)(A). [10] On the other hand, respondent asserts that the profits from the West German laundry contract were foreign base company services income to Old Dominion, which would result in all of Old Dominion's income being taxable under subpart F as foreign base company income. See sec. 954(b)(3)(B). We disagree with both parties. *440 As noted above, JETS Wascherei was a corporate entity separate from Old Dominion. The profits from the West German laundry contract were JETS Wascherei's profits, not Old Dominion's. Further, the contract was owned by J.E.T.S. and was performed by JETS Wascherei. Thus, we do not believe that any services of the type defined in section 954(e) were performed by Old Dominion for or on behalf of a related person so as to give rise to foreign base company services income with respect to it. See sec. 1.954-4, Income Tax Regs.
In addition to the interest it earned, Old Dominion's income comprised the amounts it received from JETS Wascherei pursuant to a license agreement and a profit guarantee agreement, and from the resale of supplies at a large markup. On brief, petitioners state: If JETS Wascherei were considered a separate corporation for U.S. income tax purposes, then the moneys [sic] Old Dominion Corp., S.A. received from it would constitute dividends. As such, they would be foreign personal holding company income. But the parties have stipulated that JETS Wascherei is not considered a separate corporation. In her reply brief, respondent agreed with petitioners' assertion *441 on this point "In view of the parties' stipulation, JETS Wascherei was merely a branch of whichever corporation (Old Dominion or J.E.T.S., Inc.) that owned it". As we have held, JETS Wascherei was not a branch, it was a subsidiary. Generally, sections 301 and 316 provide that any distribution of money or property by a corporation to its shareholder "with respect to its stock" is a dividend to the extent of the corporation's current and post-1913 earnings and profits. The fact that the payment, in form, is designated as compensation, consideration for property, etc. is not controlling. Southern Ford Tractor Corp. v. Commissioner, 29 T.C. 833, 840-841 (1958). The constructive dividened theory is used to prevent the syphoning off of corporate profits under the guise of a sales transaction, or any other unreal transaction, by comparing the transaction with arm's-length dealings between unrelated parties. See PPG Industries, Inc. v. Commissioner, 55 T.C. 928, 1003 (1970). In the instant matter, the amounts Old Dominion received from JETS Wascherei pursuant to the license agreement and the profit guarantee agreement clearly constituted foreign *442 personal holding company income. See sec. 553(b)(1). Likewise, we believe the amounts JETS Wascherei paid Old Dominion for supplies over the amounts Old Dominion paid for those supplies constituted dividends. Buying the supplies at over twice their cost would not arise in an arm's-length bona fide transaction; there is no evidence an unrelated party would have paid those amounts. We conclude that all of Old Dominion's income was foreign personal holding company income for 1977 through 1979. Sec. 553(a)(1). Old Dominion was therefore a foreign personal holding company. Sec. 552. Consequently, the foreign personal holding company provisions take precedence over the subpart F provisions. Sec. 951(d). We hold that Barnette failed to include in gross income, on his 1977 through 1979 returns, the undistributed foreign personal holding company income of Old Dominion. In December 1980, however, Barnette transferred 3,000 shares of preferred stock and 100 shares of common stock to Allied (which transferred those shares to Jets Services). Normally, the preferred stock shareholder is the person taxable on Old Dominion's undistributed foreign personal holding company income under *443 these facts. See sec. 1.551-2(c), Income Tax Regs. In issue 7, infra, we examine whether the existence of the preferred stock should be respected. In accordance with our determination in issue 7, we hold that Barnette was not required to include Old Dominion's undistributed foreign personal holding company income on his 1980 return. Issue 5. Bonding Fee Issue
The next issue we address is whether respondent erred in determining that Barnette failed to report $ 51,825 in bonding fee income on his 1980 return. J.E.T.S. issued a $ 103,650 check payable to Barnette and Rupert in consideration for their acting as sureties on one of its bonds. Barnette endorsed the check, sent it to Rupert, who also endorsed it and deposited it into the account of Mayfair Leasing Inc., a new leasing company they had formed. A few months later Barnette gave up his interest in Mayfair Leasing, Inc. for no consideration. Petitioners agree that Barnette did temporarily receive the income, in the form of a 50-percent interest in Mayfair Leasing, Inc., but argue that he surrendered the interest, getting nothing in return. They claim that since "the transaction was both consummated and rescinded *444 in the same year, the effect is that the two cancel out. See Rev. Rul. 80-58, 1980-1 C.B. 181. Alternatively, Barnette has a deduction under section 165 that reaches the same result". Petitioners have failed to raise even a hint of a colorable claim on this issue. Barnette clearly had $ 51,825 in bonding fee income when he received the check. His investment of it in Mayfair Leasing, Inc., thereafter was another transaction. Sec. 61. We need not address the validity of the revenue ruling raised by petitioners since it is clearly inapposite; no sale of property was rescinded whereby inherent gain in the property would be maintained through the seller's taking the same basis in the property that he had before the sale. See Rev. Rul. 80-58, supra. Further, there is no evidence that Barnette suffered a loss deductible under section 165. Surrendering stock for no consideration does not prove a loss; those facts also describe a gift. We hold for respondent on this issue. [11]
*445 Issue 6. Innocent Spouse 1977-80
The next issue that we must decide is whether Ms. Barnette should be relieved of her liability for years 1977 through 1980 on the basis of being an innocent spouse. In certain defined circumstances, section 6013(e) relieves a spouse from the joint and several liability that arises from filing a joint income tax return. To fall within section 6013(e), the claiming spouse must establish that: (1) A joint return was made; (2) the return shows a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) she did not know and had no reason to know of the substantial understatement at the time the return was signed; and (4) it is inequitable to hold her liable for the liability attributable to such understatement. Sec. 6013(e)(1); Estate of Krock v. Commissioner, 93 T.C. 672, 676-677 (1989). The claiming spouse bears the burden of establishing that each of the requirements has been satisfied. Rule 142(a); Sonnenborn v. Commissioner, 57 T.C. 373 (1971). There is no dispute that Ms. Barnette has satisfied the first two requirements. The parties therefore focus their *446 arguments on the remaining two requirements, and initially address whether Ms. Barnette knew or had reason to know of Barnette's omission of the bonding fee income for 1980, and of the deemed dividends from Old Dominion for 1977 through 1980. To meet the third requirement, where relief from liability is sought for an omission from income, the spouse must have been "unaware of the circumstances which give rise to that omission and not merely to the tax consequences of the facts". Purcell v. Commissioner, 86 T.C. 228, 238 (1986), affd. 826 F.2d 470 (6th Cir. 1987); McCoy v. Commissioner, 57 T.C. 732, 734-735 (1972). The standard to be applied in determining whether a spouse had "reason to know" is whether a reasonably prudent person who had the facts known by the claiming spouse, at the time of signing the return, could be expected to know that the tax liability was erroneous or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63. The thrust of Ms. Barnette's lack-of-knowledge evidence is that she was a housewife *447 and was not involved to any extent in her husband's business activities. As noted by respondent, however, Ms. Barnette's entire case on this issue is one of innuendo. With respect to the bonding fee income, Ms. Barnette stated on brief that she need not discuss the issue since the parties stipulated that Ms. Barnette did not have an interest in Mayfair Leasing, Inc., and the bonding fee income was omitted income attributable solely to Barnette. However, no evidence, other than her alleged general lack of knowledge of her husband's business affairs, was presented by Ms. Barnette concerning her ignorance of this transaction. Clearly she has failed to meet her burden of proof with respect to the bonding fee income. Rule 142(a). With respect to the deemed dividends from Old Dominion, while Ms. Barnette focuses her argument on her lack of knowledge as to the intricacies of her husband's affairs, we believe that the facts that she did know should have put her on notice that her husband may have omitted income on their joint return. In this regard, Ms. Barnette knew her husband owned a Panamanian corporation called Old Dominion. Further, she knew, or had reason to know, that Old *448 Dominion had income from 1977 through 1980. In this respect, while she may not have actually known the extent of Old Dominion's income, she did know that it owned JETS Wascherei which was earning income. Additionally, we believe Ms. Barnette knew that JETS Wascherei was profitable. While Ms. Barnette may not have had access to the various books and records of JETS Wascherei, we are not persuaded that she was oblivious to its operations. Indeed, it was her corporation, World Management, that was paying JETS Wascherei's U.S. managers. We believe that a reasonably prudent person with knowledge of the facts possessed by Ms. Barnette would have been alerted to the possibility of a substantial understatement when no income from Barnette's ownership of Old Dominion was reported on their joint returns. See Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. on this issue and revg. on another issue T.C. Memo. 1984-310. It is true that there is no evidence that her husband ever gave Ms. Barnette any false, misleading, or inadequate information in response to, or to forestall, any inquiry by her with respect to this income, but that is not *449 enough. Based on this record, we hold that Ms. Barnette has failed to meet her burden of proving that she did not know or have reason to know of the substantial understatements. Rule 142(a). Having reached this conclusion, we need not address whether Ms. Barnette has established that it is inequitable to make her liable. Accordingly, we hold for respondent on this issue. Issue 7. Taxability of Old Dominion Foreign Personal Holding Company Income for 1983, 1984, and 1985
The next issue that we must decide is whether respondent erred in determining that Old Dominion's foreign personal holding company income for 1983, 1984, and 1985 should be taxable to the holders of the common stock rather than the holder of the preferred stock. Petitioners bear the burden of proving that respondent's determination was in error. Rule 142(a). In December 1980, Old Dominion amended its articles of incorporation to authorize a class of preferred stock that took a high preference on dividends (see section H of our findings herein). Old Dominion then issued a stock warrant to Barnette for 3,000 shares of preferred stock, which he exercised. At that point, Barnette held 100 percent of Old *450 Dominion, as follows: 1,000 shares of common stock and 3,000 shares of preferred stock. Barnette subsequently transferred 100 shares of the common stock and all 3,000 shares of the preferred stock to Allied as a contribution to capital. Allied then transferred those 100 shares of common stock and 3,000 shares of preferred stock to Jets Services as a contribution to capital. Jets Services held those shares from December 1980 until they were redeemed in January 1985. Under Panamanian law, the preferred stock was validly issued and outstanding, and its terms were binding on Old Dominion from the time it was issued until it was redeemed. In 1983, Barnette gave 80 percent of the common stock of Old Dominion to Ms. Barnette, and 5 percent each to petitioners Leo D. and Janet L. Barnette, his children. The parties agree that Old Dominion was a foreign personal holding company during 1983, 1984, and 1985 within the meaning of section 551, and also agree as to the amount of undistributed foreign personal holding company income in each of those years. They disagree on whether the undistributed foreign personal holding company income was taxable to the holders of the common stock, as *451 determined by respondent, or to the holder of the preferred stock, as alleged by petitioners. Section 1.551-2(c), Income Tax Regs., provides: if a foreign personal holding company has both common and preferred stock outstanding and the preferred shareholders are entitled to a specified dividend before any distribution may be made to the common shareholders, then the assumed distribution of the stated portion of the undistributed foreign personal holding company income must first be treated as a payment of the specified dividend on the preferred stock before any part may be allocated as a dividend on the common stock. Petitioners, relying on the above regulation, argue that since the preferred stock was outstanding until January 1985, the undistributed foreign personal holding income for 1983 and 1984 was taxable to Allied through Jets Services, its subsidiary. We agree. Petitioners concede that a tax motivation was involved in the issuance of the preferred stock. In this respect, at the time of the transaction it was known that the West German laundry contract would soon be ending and that Old Dominion's income would thereafter be taxable to Barnette under the foreign personal *452 holding company provisions. [12] They argue, however, that Barnette also had a business purpose for the transaction in that he wanted to increase the net worth of Allied to make it better able to get bonding which facilitated its business of Government contracting. They also argue that the transaction had economic substance because the issuance of the preferred stock was legally binding on Old Dominion under Panamanian law and Old Dominion actually paid cash dividends to Jets Services in accordance with the requirements of the preferred stock. Respondent, on the other hand, claims that the income should be taxable to the holders of the common stock because the only reason for the creation of the preferred stock was tax avoidance. Even assuming, arguendo, that the only purpose for the creating of the preferred stock was tax avoidance, we fail to see how the existence of the preferred stock can be ignored. Respondent argues that *453 the above transaction was a recapitalization pursuant to section 368(a)(1)(E), and must have a business purpose to be tax free. See Gregory v. Helvering, 293 U.S. 465 (1935); sec. 1.368-1(b), Income Tax Regs. Assuming, without deciding, that respondent is correct, then the exchange of that stock in 1980 would not have been tax free; however, that is not the issue. Respondent has cited no authority for the proposition that the existence of the stock itself should be disregarded for any of the years before us. Barnette did not need a business purpose to transfer the preferred stock to Allied. On the contrary, it has been stated that the business purpose doctrine "covers only those transactions that do not appreciably change the taxpayer's financial position, either beneficially or detrimentally". Gilbert v. Commissioner, 248 F.2d 399, 412 (2d Cir. 1957) (Hand, J. dissenting), revg. and remanding T.C. Memo. 1956-137. Clearly Barnette's financial position was changed following the contribution, for Jets Services then owned the preferred stock in Old Dominion, which paid cash dividends to it in accordance with the terms of *454 that stock. While respondent implies that Barnette's financial position was not changed because he owned 100 percent of Old Dominion and 98 percent of Allied at the time of the transfer, she has not disregarded Allied's separate corporate existence. In this regard, if Allied's separate corporate existence were ignored, Barnette would be taxable on the deemed dividends from Old Dominion as the holder of the preferred stock. However, the evidence does not support a finding that Allied was unreal or a sham. Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). We hold that the existence of the preferred stock cannot be ignored. Barnette effectively transferred the tree, so he was no longer taxable on the fruit. See Lucas v. Earl, 281 U.S. 111 (1930). Accordingly, we hold that the Old Dominion foreign personal holding company income was taxable to Jets Services in 1983 and 1984, since Jets Services was the owner of all the preferred stock, which was entitled to all the income. For 1985, the common and preferred stock owned by Jets Services having been redeemed, the Old Dominion foreign personal holding company income was taxable *455 ratably to the owners of the Old Dominion stock on December 31, 1985: Ms. Barnette, Leo D., and Janet L. Barnette as subpart F income under section 951(a)(1)(A). [13]
Issue 8. $ 3,625,000 Purported Loan From Old Dominion To Allied
The District Court's sentence included a requirement that Barnette pay $ 7 million in restitution within one year of his confinement. Barnette was ordered to pay the $ 7 million in restitution, or to post a bond for a like amount, in order to remain free during the pendency of his criminal appeal. Allied adopted corporate resolutions acknowledging that the $ 7 million obligation was its own, and raised the $ 7 million from several sources, including $ 3,625,000 obtained from Old Dominion, in January 1985 (see our findings of fact, section J, supra). A promissory note and a security agreement designating this transfer as a loan were drawn up. As of December *456 31, 1984, Old Dominion's earnings invested in U.S. property were $ 1,079,622, representing a loan to Jets Services. This loan was canceled in partial payment for the redemption of the Old Dominion preferred and common shares held by Jets Services. Respondent determined that the cancellation of this preexisting investment in U.S. property, in combination with the $ 3,625,000 loan to Allied, resulted in an increase in Old Dominion's earnings invested in U.S. property of $ 2,545,378. Pursuant to sections 951 and 956, respondent determined that the increase in earnings invested in U.S. property was taxable to Barnette as the shareholder of Old Dominion. In making this determination, respondent disregarded the August 19, 1983, transfer of 80 percent of the common stock to Ms. Barnette and 5 percent of the common stock to each of their children, petitioners Leo D. and Janet L. Barnette (the children), all the remaining common stock which Barnette owned. Alternatively, respondent determined that the increase in earnings invested in U.S. property was taxable on a pro rata basis to Ms. Barnette and the children. Prior to trial, respondent stipulated that Ms. Barnette and the children *457 owned their respective shares of Old Dominion common stock from 1983 on. On brief, respondent now asserts as her "primary position" that the purported loan was actually a dividend to Barnette by virtue of the constructive stock ownership rules of section 318(a)(1)(A). Alternatively, respondent still maintains that Ms. Barnette and the children should have respectively reported their pro rata share of the income as a result of an increase in earnings invested in U.S. property by Old Dominion. We first examine whether this was an actual dividend to Barnette. By its terms, section 318(a) applies only "For purposes of those provisions of this subchapter (secs. 301-383) to which the rules contained in this section are expressly made applicable". (Emphasis added.) Section 301(c)(1), the provision relied on by respondent to impose dividend treatment on Barnette, does not expressly incorporate section 318. Whether or not the purported loan was a dividend, it was not reportable by Barnette as such since he was not a shareholder in Old Dominion. We therefore address whether this loan gave rise to deemed dividends to Ms. Barnette and the children. Section 951(a)(1)(B) requires each *458 U.S. shareholder of a controlled foreign corporation to include in income his pro rata share of the corporation's increase in earnings invested in U.S. property. Section 956(b)(1)(C) defines U.S. property to include an "obligation" of a U.S. person. An obligation of a U.S. person, for purposes of section 956(b), is broadly defined to include various forms of indebtedness, except it does not include: (ii) Any indebtedness (other than an indebtedness arising in connection with the sale or processing of property) which -- (a) Is collected within one year from the time it is incurred, or (b) Matures within one year from the time it is incurred but is not collected within such period solely by reason of the inability or unwillingness of the debtor to make payment within such period. For purposes of (b) of this subdivision, a failure to collect an indebtedness within the one-year period will not be attributed to inability or unwillingness on the part of the debtor to make payment unless it is clearly established that the creditor has made reasonable efforts to collect such indebtedness within such period. * * * [Sec. 1.956-2(d)(2), Income Tax Regs.] The parties' disagreement *459 on this issue concerns whether Allied's note to Old Dominion for the $ 3,625,000, which by its terms matured within 1 year from the date it was incurred, will nonetheless not be excepted from the definition of an obligation of a U.S. person for purposes of section 956(b). Respondent's position is that the maturity date of less than 1 year on the note did not comport with reality. Alternatively, respondent asserts that Ms. Barnette and/or Old Dominion did not make reasonable efforts to collect on the note. Initially, we consider whether Ms. Barnette and Old Dominion could have reasonably expected full repayment within 1 year under the circumstances. Respondent argues that full repayment could not have been expected within 1 year because: Allied adopted a plan of liquidation at the time of the loan; it was unlikely Barnette's criminal conviction would be reversed on appeal; in the event of an affirmance, the Government would "take every possible step" to prevent the bond from being released; and the security for the loan was "clearly inadequate". Petitioners respond to each of respondent's arguments by asserting that: Allied's liquidation under Delaware law could not be completed *460 until all debts were paid; in hindsight it was apparent that the Government would not acquiesce on the return of the bond, but that fact was not known until the 1985 Civil Action had been filed; and the security was substantial, if not equal to the face amount of the note, but in any event the parties to the note expected it to be repaid from the return of the $ 7 million bond. In this respect, petitioners argue that everyone believed that the bond would be returned whether or not Barnette's appeal was successful, since the District Court's sentence imposed $ 7 million in restitution within 1 year from the date of Barnette's incarceration. We are persuaded that Ms. Barnette and/or Old Dominion contemplated that the transfer would be repaid within one year. Rule 142(a). In this respect, the District Court's order can be interpreted as supporting the position that the $ 7 million would be returned following appeal, with the $ 7 million restitution sentence payable within one year of incarceration if Barnette's criminal conviction were upheld. In hindsight, that belief may have been unwarranted. However, we believe that Old Dominion and Allied entered into a bona fide loan transaction. *461 Alternatively, respondent asserts that Old Dominion took absolutely no action to collect the amount owed, or to forfeit the security, when the note became due. Ms. Barnette testified that she had been advised by her attorneys that an attempt to collect on the debt would appear to demonstrate bad faith in connection with the litigation in the 1985 Civil Action since it would result in removing funds from the United States. Respondent, however, asserts that Ms. Barnette's testimony ignores the fact that any funds recovered from Allied could have been placed on deposit in the United States rather than removed from the United States. In Dougherty v. Commissioner, 60 T.C. 917, 936 (1973), this Court recognized that when the circumstances are such that collection efforts would be futile, a taxpayer can satisfy the "inability of the debtor" exception of section 1.956-2(d)(2)(ii)(b), Income Tax Regs., without taking overt steps to collect. At the time the note became due in the instant matter, the appeal to the Circuit Court had not yet been decided. Consequently, the $ 7 million posted as bond was still in the registry of the District Court. Additionally, the 1985 *462 Civil Action had since been initiated by the Government. We believe that it was apparent to everyone at that time that the Government would use whatever means it had at its disposal to freeze Barnette's, and his corporations', assets, wherever located. We believe petitioners have satisfied their burden of showing that the loan from Old Dominion to Allied was excepted from the definition of an obligation of a U.S. person for purposes of section 956. Rule 142(a); Dougherty v. Commissioner, supra; sec. 1.956-2(d)(2), Income Tax Regs. Accordingly, we hold for petitioners on this issue. Having determined that the transfer from Old Dominion to Allied constituted a valid loan, and is not taxable to Barnette as an increase in earnings invested in U.S. property by Old Dominion, we likewise hold that Allied is entitled to a $ 31,839.75 interest deduction on its 1985 consolidated return for the April 2, 1985, payment made in that amount by its subsidiary Jets Services to Old Dominion. Issue 9. Dividend from Allied for Bond Payment
The next issue that we must determine is whether Barnette failed to report a total of $ 5,930,378 of income as a result of Allied's *463 making $ 7 million available to him to post bond. Respondent's notice determined that Barnette received $ 3,385,000 of this amount as a dividend from Allied, and, as noted in the previous issue, $ 2,545,378 of this amount as a deemed dividend from Old Dominion pursuant to sections 951 and 956. Respondent now asserts that Barnette received a $ 7 million dividend from Allied in this transaction, but concedes that the maximum amount of dividends from Allied for the year 1985 for which Barnette would be liable is limited to $ 5,930,378. Respondent argues that any corporate distribution to its shareholders with respect to its stock constitutes a dividend under section 316(a)(1) to the extent of earnings and profits. See sec. 301(c)(1). The $ 7 million bond, as well as the $ 7 million restitution obligation, were Barnette's personal obligations. Consequently, respondent argues that Allied's payment of the $ 7 million resulted in a $ 5,930,378 dividend to Barnette. See Sachs v. Commissioner, 32 T.C. 815 (1959), affd. 277 F.2d 879 (8th Cir. 1960). Petitioners argue that if this Court determines that Barnette had a constructive distribution, the *464 transaction should be considered a wash since Barnette should be deemed to have made a constructive payment of the $ 7 million restitution obligation. We disagree. Petitioners have cited no authority for the proposition that the transaction should be considered a wash. We hold that the receipt and payment must be considered two separate transactions. We analyze in issues 12 and 13, infra, whether Barnette was entitled to a deduction for any payment made. On the other hand, we do agree with petitioners that the distribution did not constitute a dividend under section 301. On the same day that Allied made this amount available to Barnette, January 9, 1985, it had adopted a plan of liquidation. Accordingly, we believe the distribution should be considered as payment, at least in part, for Barnette's stock, resulting in capital gain to the extent that the distribution exceeded his basis. Sec. 331. Issue 10. Redemption of Old Dominion Stock in 1985
The next issue we must decide is whether respondent erred in determining that the 1985 redemption of Old Dominion common and preferred stock, held by Jets Services (which was the wholly owned subsidiary of and filed a consolidated *465 return with Allied) resulted in ordinary income to Allied. This requires us to consider the factual and legal relationships which obtained in 1985 between Barnette, Ms. Barnette, Leo D. and Janet L. Barnette, Allied, Jets Services, and Old Dominion. Barnette had continuously owned between 95 and 98 percent of the stock of Allied, as we have previously found. In turn, Allied owned all of the stock of Jets Services, and filed consolidated returns with it. In August 1983, Barnette gave 80 percent of the common stock of Old Dominion to Ms. Barnette, and 5 percent each to Leo D. and Janet L. Barnette, his children. This was all the remaining stock he owned in Old Dominion. Previously, in December 1980, Barnette had transferred 10 percent of the common stock in Old Dominion, and all of the new preferred stock, which he had subscribed to, to Allied, which immediately transferred the same to Jets Services as a contribution to capital. Then, on January 9, 1985, Old Dominion redeemed its stock which was owned by Jets Services, paying $ 2,400,000 therefor. The question presented is whether the gain resulting from that redemption should be treated as ordinary income or capital gain. *466 As of the time of this redemption Barnette had parted with all his direct ownership of Old Dominion stock. However, since the tax treatment of this transaction is governed by section 302, the provisions of section 318, regarding the constructive ownership of stock, will apply here. Sec. 302(c). Under the provisions of section 318(a)(1)(A), Barnette constructively owned the Old Dominion stock which had previously been given to Ms. Barnette, to Leo D. Barnette, and to Janet L. Barnette. Barnette actually owned practically all the stock of Allied, as we have said; for this reason, Allied owned the Old Dominion stock which was attributable to Barnette as we have indicated above. Sec. 318(a)(3)(C). Jets Services actually owned the stock of Old Dominion which had been donated to it. At the same time, however, Jets Services is considered also to have owned the stock which was constructively owned by Allied, also under section 318(a)(3)(C); in this situation, the successive attribution of Old Dominion stock from Barnette to Allied, and from Allied to Jets Services, does not appear to run afoul of the restrictions of section 318(a)(5)(C). See sec. 1.318-4, Income Tax Regs.
As the *467 result of following this rather tortuous path, it turns out that at the time of the stock redemption, Jets Services was considered as the sole owner of Old Dominion: 100 percent of the preferred and 10 percent of the common by actual ownership, and the rest by attribution from the Barnettes and Allied, under the provisions of section 318. As a result, we must hold that the transaction is not entitled to capital gain treatment. Although it was a redemption within the meaning of section 317(b), see sec. 302(a), the requirements of section 302(b) were not satisfied for the following reasons: (1) Section 302(b)(1) does not apply because, under the circumstances, the distribution to Jets Services must be considered as the equivalent of a taxable dividend to the sole shareholder; (2) section 302(b)(2) does not apply because the distribution was not substantially disproportionate -- Jets Services owned all the stock of Old Dominion, both before and after the redemption; (3) section 302(b)(3) does not apply because the interest of the sole shareholder -- Jets Services -- was not terminated; and (4) section 302(b)(4) does not apply because the transaction was not a partial liquidation. As *468 a result, we must hold that this transaction should have been treated in the consolidated return filed by Jets Services and Allied as an ordinary income distribution under section 301. Sec. 302(d). As a further result, respondent's argument that the provisions of section 1248 apply is misplaced. Sec. 1248(g)(2)(A). Likewise, we hold that section 306 has no application because there is no indication in this record that the preferred stock involved in the redemption was section 306 stock. The record shows that the stock was purchased for cash, and there is no indication that the price was less that the fair market value. We accordingly sustain respondent on this issue. Issue 11. Section 6653(b) Additions to Tax for Fraud
The next issue that we must decide is whether respondent has met her burden of proving that Barnette's underpayments of tax for years 1977, 1978, 1979, and 1980, and Allied's underpayments of tax for fiscal years ending May 31, 1975, 1978, 1979, 1980, 1981, and 1982 were due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To satisfy this burden, respondent must establish that the taxpayer *469 intended to evade a tax known or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud is not to be imputed or presumed, but rather must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). The existence of fraud is a question of fact and must be resolved upon consideration of the entire record. Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Fraud may be established by circumstantial evidence and reasonable inferences derived therefrom, since direct proof of intent is rarely available. Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Where fraud is determined for several years, respondent's burden applies separately for each of the years. Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), *470 affd. per curiam sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). Generally, attempting to conceal illegal activities is a badge of fraud, along with understated income, inadequate records, implausible or inconsistent explanations of behavior, and concealment of assets. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601. A taxpayer's dishonesty in business transactions in defrauding others may indicate a willingness to defraud the Government. McGee v. Commissioner, 61 T.C. 249, 260 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The sophistication of the taxpayer is relevant to the determination of fraud. Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949), affg. 7 T.C. 245 (1946). Finally, the conviction of a taxpayer for willfully attempting to evade his income tax for one year is evidence of intent or motive of in like conduct at or near the same time and, accordingly, is admissable to show motive or intent in prior and subsequent years. Register v. Commissioner, T.C. Memo. 1990-576. *471 With respect to Allied, we hold that respondent has failed to meet her burden of proof. Rule 142(b). As noted above, the profits from the West German laundry contracts were not reportable on Allied's consolidated returns. While Allied has conceded various issues in this case, we are not convinced that any of the resulting underpayments was due to fraud. We also note that Allied reported gain (rightly or wrongly) on the sale of JETS Wascherei. We hold that respondent has failed to prove that Allied was fraudulent in any of the years at issue. With respect to Barnette's additions to tax for fraud, Barnette concedes that he is collaterally estopped from opposing the fraud addition for years 1978 and 1979. Consequently, we must decide whether respondent has proven by clear and convincing evidence that Barnette was fraudulent in 1977 and/or 1980. At trial, respondent rested her case following the completion of petitioners' presentation, relying on the stipulated facts and the evidence presented by petitioners. In 1977, the record is clear that Barnette was backdating documents to show that JETS Wascherei had been transferred to Old Dominion in 1976. While Barnette testified *472 that he thought that backdating the documents was irrelevant because it showed the transfer occurring in Allied's fiscal year ending May 31, 1977, we are convinced that the backdating of the documents was done in an attempt to hide his and Allied's interest in JETS Wascherei from the Small Business Administration. Evidence was received that Barnette discussed the tax consequences of the West German laundry contract with Price Waterhouse & Co. Evidence was also received that Barnette was familiar with the provisions of subpart F. However, Barnette did not inform respondent of his ownership of Old Dominion until 1980. We are convinced that his failure to do so was due to an intent on his part to evade a tax he believed to be owing. Stoltzfus v. United States, supra.We have found Barnette's 1977 underpayment was due to fraud. In 1980, the West German tax authorities began investigating Barnette's foreign corporations. In December 1980, Barnette filed amended returns for 1977, 1978, and 1979. On those returns, he informed respondent of the existence of Old Dominion, its ownership of Jets Wascherei, and the existence of Markham Corp., S.A. and Hamilton *473 Insurance. Those returns also disclosed that Barnette was treating Jets Wascherei as a branch of Old Dominion. While we are convinced that Barnette was fraudulent for years 1977, 1978, and 1979, we are not convinced that he was fraudulent for 1980. Rule 142(b). Barnette made his disclosures to respondent under the advice of counsel. He was also advised by Price Waterhouse & Co. that Old Dominion's income was not taxable to him in 1980. Respondent argues that Barnette did not make full disclosure to either her or to Price Waterhouse & Co. She also argues that Barnette's actions in the past should be attributed to him in 1980 in that he was still operating on a scheme to evade tax. While we are suspicious of his behavior, we are not sufficiently convinced that Barnette was fraudulent in 1980. Rule 142(b). We have found that Barnette's understatements of tax were due to fraud only in years 1977, 1978, and 1979. Issue 12. Credit Pursuant to 18 U.S.C. Section 3663(e)(2)(A) (1988)
The next issue that we must decide is whether Barnette may credit the restitution that he paid, pursuant to the District Court's sentence, against his fraud additions to tax. The District Court *474 ordered Barnette to pay restitution under the authority of the Victim and Witness Protection Act (VWPA), what is today 18 U.S.C. section 3663(a) (1988) (formerly 18 U.S.C. section 3579(a)). The VWPA also provides that "any amount paid to a victim under an order of restitution shall be set off against any amount later recovered as compensatory damages by such victim in * * * any Federal civil proceeding". 18 U.S.C. sec. 3663(e)(2) (1988). On brief, petitioners state that "Barnette was convicted of tax fraud for 1978 and 1979, and was punished. If additions to tax for fraud are imposed on Barnette for 1978 and 1979, they will violate the Constitutional prohibition of double jeopardy unless they can be fairly said to be solely remedial in nature rather than punitive. United States v. Halper, 490 U.S. 435 (1989). If additions to tax for fraud are remedial in nature, it would seem to follow that they are compensatory damages within the meaning of 18 U.S.C. section 3663(e)(2)(1988)". Petitioners argue that Barnette should be able to credit $ 7 million against any additions to tax for fraud that this Court may determine. We have already rejected petitioners' claim *475 that the imposition of the fraud additions to tax violates the Constitutional prohibition against double jeopardy. Barnette v. Commissioner, 95 T.C. 341 (1990). Likewise, this Court recently addressed arguments similar to those raised by petitioners with respect to their double jeopardy claim in Ianniello v. Commissioner, 98 T.C.     (1992). Additions to tax for fraud are characterized as remedial in nature and, therefore, do not constitute double jeopardy. Thus, we examine petitioners' claim under the context of the VWPA. The VWPA authorizes the District Court judge to impose restitution only for violations of title 18 of the United States Code and for certain enumerated offenses under the Federal Aviation Act of 1958, 49 U.S.C. section 1472. See 18 U.S.C. sec. 3663(a) (1988). Thus, by its express terms, the VWPA does not apply to title 26 of the United States Code tax violations, and the Court of Appeals for the Sixth Circuit has so held. United States v. Joseph, 914 F.2d 780, 784 (6th Cir. 1990).
On the other hand, in United States v. Helmsley, 941 F.2d 71 (2d Cir. 1991), the Court of Appeals for the Second *476 Circuit affirmed a District Court order imposing restitution for violations of title 18 of the United States Code where the restitution comprised, inter alia, unpaid Federal income taxes. The Second Circuit rejected the taxpayer's argument that restitution for unpaid taxes could not be imposed in that proceeding, reasoning that the title 18 of the United States Code violations were "distinct from their underlying predicate acts and purposes, and involve additional harms." Id. at 101. The Court went on to state, however, that "it is self-evident that any amount paid as restitution for taxes owed must be deducted from any judgment entered for unpaid taxes in such a civil proceeding". Id. at 102. (Emphasis added.) In the instant matter, the District Court imposed Barnette's $ 7 million restitution sentence for violations of title 18 of the United States Code. In his criminal appeal, Barnette contended, inter alia, that the District Court lacked authority to order restitution on the conspiracy count because the conspiracy occurred prior to January 1, 1983, the effective date of the VWPA. United States v. Barnette, 800 F.2d 1558, 1570 (11th Cir. 1986). *477 In rejecting Barnette's argument, the Eleventh Circuit stated that many acts were performed and statements made in furtherance of the conspiracy after January 1, 1983; included within the acts listed by the Eleventh Circuit were acts and/or statements "which served to perpetrate the fraud on the IRS". Id. at 1571. Petitioners argue that Barnette should be able to offset the $ 7 million restitution he paid against the fraud additions to tax determined in this proceeding since the restitution was authorized in "major part because the Eleventh Circuit thought Barnette was perpetrating a fraud on the Internal Revenue Service". We disagree. The Eleventh Circuit affirmed the District Court's sentence, which imposed restitution concurrently with respect to the counts of conspiracy, mail fraud, false statements, and RICO, holding that only the part of the sentence ordering restitution for the bribery count was vacated. Id. at 1572. As to the conspiracy count, the Eleventh Circuit said there were many acts performed and statements made, only some of which dealt with respondent. In Barnette v. Commissioner, T.C. Memo. 1990-535, *478 we held that United States v. Barnette, 800 F.2d 1558 (11th Cir. 1986), by itself, did not have any collateral estoppel effect in this proceeding, with respect to particular facts, except as to the fact of tax fraud itself, as Barnette has conceded. We made that determination in light of the fact that the jury could have found alternative facts upon which to base its decision. We believe that same analysis applies to the District Court judge because she had various facts to consider when imposing the restitution sentence. The District Court's restitution order was imposed concurrently with respect to four counts under title 18 of the United States Code. Only one of those counts was even arguably affected by title 26 of the United States Code. We believe the restitution imposed in Barnette's criminal case under title 18 of the United States Code was distinct from the additions to tax for fraud he has been found liable for in this proceeding. Under the circumstances present in this case, we hold that no part of Barnette's fraud additions to tax may be offset by any amounts he has paid or will pay in restitution. We therefore hold for respondent on this issue. *479 Issue 13. Bond Posting as a Section 165 Loss
The next issue that we must decide is whether Barnette is entitled to a deduction for the $ 7 million that he posted as bond in 1985. As noted above, we held that this transaction did not result in a wash or offset. Barnette contends that he is entitled to a deduction for this amount in 1985 under section 165. [14]
A cash basis taxpayer is entitled to allowable deductions in the year in which payment is made. Sebring v. Commissioner, 93 T.C. 220, 224 (1989); sec. 1.461-1(a)(1), Income Tax Regs. Under section 165, a loss is deductible in the taxable year in which the loss was in fact sustained. Sec. 165(a); Boehm v. Commissioner, 326 U.S. 287, 292 (1945); *480 Halliburton Co. v. Commissioner, 93 T.C. 758, 770 (1989), affd. 946 F.2d 395 (5th Cir. 1991); sec. 1.165-1(d), Income Tax Regs.
Respondent contends that, even if Barnette sustained a deductible loss on the above transaction, the loss was not sustained in a year before the Court. On the other hand, petitioners claim that the loss was sustained in 1985 pursuant to section 461(f) since the amounts were paid to satisfy the liability in 1985. Section 461(f) applies to cash basis, as well as accrual method, taxpayers. Weber v. Commissioner, 70 T.C. 52, 55 n.4 (1978). It provides that: (f) CONTESTED LIABILITIES. -- If -- (1) the taxpayer contests an asserted liability, (2) the taxpayer transfers money or other property to provide for the satisfaction of the asserted liability, (3) the contest with respect to the asserted liability exists after the time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year) determined after application of subsection (h), then the deduction shall be allowed for the *481 taxable year of the transfer. This subsection shall not apply in respect of the deduction for income, war profits, and excess profits taxes imposed by the authority of any foreign country or possession of the United States. Petitioners bear the burden of proving that each of these requirements have been satisfied. Rule 142(a). With respect to the $ 7 million bond in the instant matter, we believe that petitioners have failed to satisfy the second requirement; i.e., that there was a transfer of money or other property to provide for the satisfaction of the asserted liability. In this regard, the record is clear that at the time the $ 7 million bond was posted, it was made as an appearance bond, not to provide for the satisfaction of the restitution sentence. Petitioners contend, however, that although the bond was initially posted as an appearance bond, by the end of the year everyone involved in the transaction knew that the bond would not be returned to Barnette. They claim that the bond should therefore be viewed as a bond of restitution. We disagree. The District Court's order credited Barnette with interest accruing on the funds from January 10, 1985, to January 9, 1986. *482 January 9, 1986, was the earliest date on which the restitution was to be paid pursuant to the terms of Barnette's sentence. Consequently, we believe that the earliest date at which it could even be argued that Barnette could be viewed as having transferred funds to satisfy the restitution obligation was in 1986. However, we need not, and do not, make that determination in this proceeding. We hold that Barnette is not entitled to a $ 7 million deduction in 1985; no deductible liability for which he was responsible had been established in that year. Issue 14. Sale of Old Dominion of Florida
The next issue that we must decide is whether respondent erred in determining that both Barnette and Ms. Barnette failed to report capital gain on their separate returns for the disposition of Old Dominion of Florida. The Department of Justice included Old Dominion of Florida as a defendant in the 1985 Civil Action. The Florida insurance authorities then filed their own lawsuit attempting to act as a receiver and liquidate the insurance company. The Barnettes subsequently sold their stock in 1985, and, pursuant to an agreement with the Department of Justice, the sales proceeds *483 were deposited with the District Court to be disposed of in accordance with the ultimate outcome of the 1985 Civil Action. Respondent's position is that petitioners realized capital gain on the sale of the stock within the meaning of section 1001. She also argues that the subsequent forfeiture of the proceeds is a separate transaction which is governed by section 162(f). Petitioners claim that their position is simple: "they got nothing and should not be taxed". They claim that the sale of Old Dominion of Florida should not be treated as a separate transaction from the payment of the proceeds into the District Court. They claim that the only thing that Barnette and Ms. Barnette received was a contingent right to receive part or all of the money deposited with the District Court depending on how the District Court ultimately resolved the 1985 Civil Action. In this regard, they claim that under the rule of Burnet v. Logan, 283 U.S. 404 (1931), the transaction must be left open and not taxed until and unless Barnette and Ms. Barnette actually received funds in excess of their basis in Old Dominion of Florida. A cash basis taxpayer is required to report as gross *484 income items which he has actually or constructively received. Sec. 451(a); North American Oil Consolidated Co. v. Bunet, 286 U.S. 417 (1932); sec. 1.451-1, Income Tax Regs. Income is constructively received when "it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given". Sec. 1.451-2(a), Income Tax Regs.
The record in this case is clear that Barnette and Ms. Barnette did not get actual or constructive receipt of the sales proceeds placed in the registry of the District Court. Respondent's reliance on Kerr v. Commissioner, 5 B.T.A. 1073 (1927), where income that was actually received was immediately placed in trust as security for taxes, is therefore distinguishable. Respondent argues, however, that the proceeds were income to the Barnettes whether or not they ever actually received them because distribution of those proceeds to the Government, if it occurs, will be in satisfaction of their debt to the Government. See Poczatek v. Commissioner, 71 T.C. 371 (1978); *485 Kasey v. Commissioner, T.C. Memo. 1976-266. Respondent's assertion that disbursement to the Government will be in satisfaction of a debt may or may not be the correct view of this transaction, but in any event it did not occur in any of the years before us. The right to receive the sales proceeds was contested in 1985, and it still is. We hold that respondent erred in determining that Barnette and Ms. Barnette should have reported on their 1985 separate returns the gain from the sale of Old Dominion of Florida. Issue 15. Section 6661 Substantial Understatement
The final issue that we must resolve is whether respondent erred in determining that additions to tax for substantial understatement pursuant to section 6661 applied to Barnette's 1985 separate return, the Barnettes' 1983 and 1984 returns, Allied's fiscal 1984 and 1985 returns, Ms. Barnette's 1985 separate return, and the 1984 and 1985 separate returns of Leo D. and Janet L. Barnette. All significant adjustments on those returns arise from four issues: (1) The undistributed foreign personal holding company income of Old Dominion for 1983, 1984, and 1985; (2) the increase in Old Dominion's earnings *486 invested in U.S. property in 1985; (3) the nonrecognition of gain from the sale of the Old Dominion of Florida stock in 1985; and (4) the redemption of Old Dominion stock held by Jets Services in 1985. Section 6661(a) imposes an addition to tax for substantial understatement of income tax. An understatement is substantial if it exceeds the greater of $ 5,000 [15] or 10 percent of the amount required to be shown on the return. Sec. 6661(b)(1)(A). The amount of the understatement is reduced for any portion of the understatement due to the tax treatment of an item by petitioner for which he had substantial authority or for which he adequately disclosed the relevant facts concerning the item's tax treatment. See sec. 6661(b)(2)(B). Substantial authority for the tax treatment of an item exists when the authority supporting that treatment is substantial in relation to the weight of authority supporting the contrary position. See sec. 1.6661-3(b)(1), *487 Income Tax Regs. Adequate disclosure is made if respondent is provided sufficient information to identify the controversy involved. See Schirmer v. Commissioner, 89 T.C. 277, 285-286 (1987). Respondent concedes that the section 6661 addition to tax is inapplicable to Barnette's 1985 separate return, Allied's consolidated return for fiscal year ended May 31, 1985, and the 1984 and 1985 separate returns of Leo D. and Janet L. Barnette. As for the 1983 and 1984 joint returns of the Barnettes, we have held that the undistributed foreign personal holding company of Old Dominion for those years was taxable to the holder of the preferred stock rather than the holders of the common stock. Accordingly, the section 6661 addition to tax is not applicable to the Barnettes' 1983 and 1984 joint returns since there was no substantial understatements for those years. As for Allied's fiscal year ending May 31, 1984, consolidated return, we have held that Allied through Jets Services, as the owner of Old Dominion's preferred stock, was taxable on all of Old Dominion's undistributed foreign personal holding company income for 1983. The parties have stipulated that Old Dominion *488 had $ 426,708 of foreign personal holding company income for that year. Allied only reported itself taxable on $ 226,800 of that amount, the amount actually distributed, on its 1984 consolidated return because it originally claimed Old Dominion did not have taxable foreign personal holding company income. However, all the figures relied on by respondent in making her determination were taken directly from Old Dominion's income statement attached to the Form 5471 which was filed with Allied's consolidated return. We believe respondent was provided adequate disclosure for this item. See sec. 1.6661-4(a), Income Tax Regs. Thus, we hold that section 6661 is not applicable to Allied's fiscal year ending May 31, 1984, consolidated return. As for Ms. Barnette's 1985 separate return, we have held that respondent erred in determining that Ms. Barnette failed to include as income on her 1985 return a pro rata share of Old Dominion's increase in earnings invested in U.S. property, which respondent claimed was attributable to Old Dominion's $ 3,625,000 loan to Allied. We have also held that respondent erred in determining that Ms. Barnette was required to report gain from the sale of her *489 Old Dominion of Florida stock where the proceeds from that sale were placed in the registry of the District Court. Thus, Ms. Barnette's understatement must be reduced by the amounts attributable to those items. The remaining item concerns Old Dominion's undistributed foreign personal holding company income in 1985 which was taxable to the holders of the common stock under subpart F, as we have held. The parties stipulated that Old Dominion had $ 667,745 of undistributed foreign personal holding company income for 1985. Ms. Barnette was taxable on 800/900 (89 percent) of that amount, and in fact reported $ 152,207 on her 1985 separate return. As in Allied's fiscal 1984 return, the figures used by respondent to make her determination against Ms. Barnette for 1985 were taken from Old Dominion's income statement attached to the Form 5471 filed with Ms. Barnette's 1985 return. We hold that respondent was provided adequate disclosure and that respondent erred in determining that Ms. Barnette's 1985 separate return was subject to section 6661. Sec. 1.6661-4(a), Income Tax Regs.
Based on the foregoing and the concessions by the parties, Decisions will be entered under Rule 155 *490 . Footnotes
1. Cases of the following petitioners are consolidated herewith: Allied Management Corp., docket No. 22809-82; Larry D. Barnette and Kathleen C. Barnette, docket No. 535-85; Allied Management Corp., docket No. 620-85; Allied Management Corp., docket No. 29224-85; Larry D. Barnette and Kathleen C. Barnette, docket No. 355-88; Larry D. Barnette, docket No. 3282-88; Larry D. Barnette, docket No. 3283-88; Allied Management Corp., docket No. 3285-88; Janet L. Barnette, docket No. 11681-88; Leo David Barnette, docket No. 11682-88; and Kathleen C. Barnette, docket No. 17821-88.↩
1. Income tax (chapter 1). ↩
2. Sec. 1442 withholding. ↩
3. Plus 50 percent of the interest due on $ 40,020 pursuant to sec. 6653(a)(2)↩.
2. Docket No. 3283-88, dealing with sec. 1442 withholding, has been settled by stipulation. Numerous issues in the remaining dockets have likewise been settled. ↩
3. All statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
4. Barnette was incarcerated in a Federal prison in Kentucky at the time he filed his petitions in docket Nos. 355-88, 3282-88, and 3283-88, but his legal residence remained Jacksonville, Florida.↩
5. At all relevant times, Allied, through J.E.T.S., beneficially owned the entire interest in Jets Boiler Services GmbH.↩
6. Barnette now concedes that this amount, as well as $ 232,475 reported in 1979, should have been reported as ordinary income from constructive dividends rather than capital gain.↩
7. Our use of the term "loan", as well as the documents and the various amounts paid in relation to it, is for ease of analysis while setting forth the facts of this case. We discuss below whether this arrangement actually constituted a loan for tax purposes.↩
8. See and compare Rev. Rul. 77-214, 1977-1 C.B. 408↩, for a statement of respondent's position regarding the classification of a GmbH as an association taxable as corporation for Federal income tax purposes.
9. The subpart F provisions take precedence for years beginning after July 18, 1984. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 132, 98 Stat. 666.↩
10. Pursuant to sec. 552(a)(1), a foreign corporation is not a "foreign personal holding company" unless at least 60 percent of its gross income for the taxable year is foreign personal holding company income (50 percent for years subsequent to the initial year of qualification). Since secs. 551 and 951 do not overlap under petitioners' argument, sec. 951 would be applicable. Sec. 951(d)↩.
11. The parties have agreed that if Barnette is held to have received income, as here, he is entitled to deduct $ 663 as his share of the net loss of Mayfair Leasing, Inc., for its fiscal year 1981.↩
12. In issue 4, we found that it was taxable to Barnette even before the contract ended.↩
13. As noted supra↩ note 9, subpart F takes precedence over the foreign personal holding company provisions in 1985.
14. Allied took a $ 7 million deduction on its consolidated return for fiscal year ending May 31, 1985. Petitioners concede that Allied was not entitled to this deduction in the event that this Court determines that the laundry contract profits were not reportable by it, as we have done. See issue 2, supra↩.
15. $ 10,000 for corporations other than S corporations. Sec. 6661(b)(1)(B)↩.